GLYCamIN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
BRUNSWICK DIVISION

| | | |
|---|---|---|
| ALDA GENTILE & CODY A. WHITE, | ) | |
| | ) | |
|   Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | Civil Action File No. _____ |
| BLAKE TAYLOR, WILL WOOLARD | ) | |
| and  CEDRIC L. BROWN, individually, | ) | |
| | ) | **Jury Trial Demanded** |
|   Defendants. | ) | |

## COMPLAINT

**COMES NOW**, Plaintiff **Alda Gentile and Cody A. White** and file their

Complaint against Defendants Georgia State Patrol trooper **Blake Taylor and** Camden

County Sheriff's Office employees **Will Woolard** and **Cedric Brown,** as follows:[1]

## PRELIMINARY STATEMENT

This civil rights action for money damages arises from Defendants' willful

violations of the Fourth Amendment.  In response to Woolard's questions, White told

him that Gentile had money in the trunk of their rental car.  Defendants then conspired

to seize Gentile's money despite knowing with absolute certainty that they did not have

any evidence to believe Plaintiffs' were involved in criminal activity or were harboring

---

[1] Plaintiffs will refer to the Camden County Sheriff's Office by the acronym, "CCSO" and the Georgia
State Patrol by the acronym, "GSP." Plaintiffs refer to the parties collectively as either "Plaintiffs" or
"Defendants."  Plaintiffs refer to the parties individually by individually by last name.

Page 1 of 22

illegal drugs or other substances in their car.  Defendants unlawfully detained Plaintiffs on the shoulder of I95 for more than three hours; fabricated evidence of probable cause to justify searching the trunk of Plaintiffs' car; and seized Gentile's property - $11,530.00 – without a shred of evidence, let alone probable cause, that the money was associated with illegal activity of any kind.  Plaintiffs demands a jury trial and seek an award of economic, compensatory and punitive damages as allowed by 42 U.S.C. § 1981(a) and, upon return of a verdict in their favor, an award of attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

### JURISDICTION AND VENUE

1.    This Court has original jurisdiction over Plaintiff's federal civil rights claims pursuant to 28 U.S.C. §§ 1331 and 1343.

2.    Pursuant to 28 U.S.C. § 1391 venue is proper in this District and Division as at least one of the Defendants resides therein and the cause of action arose therein.

### PARTIES

3.    Alda Gentile is a citizen of the State of New York with standing to bring this action in this Court.

4.    Cody White is a citizen of the State of New York with standing to bring this action in this Court.

5.    Blake Taylor is a resident of Glynn County, Georgia and is subject to the

Page 2 of 22

personal jurisdiction of this Court.  Taylor may be personally served Summons and a copy of the Complaint at his place of business:  Georgia State Patrol Post 35, 901 Jekyll Causeway, Jekyll Island, Georgia 31527.

6.   Will Woolard is a resident of Camden County, Georgia and is subject to the personal jurisdiction of this Court.  Woolard may be personally served with Summons and a copy of the Complaint at his place of business:  Camden County Sheriff's Office, Woodbine, Georgia 31569.

7.   Cedric Brown is a resident of Camden County, Georgia and is subject to the personal jurisdiction of this Court.  Brown may be personally served with Summons and a copy of the Complaint at his place of business:  Camden County Sheriff's Office, Woodbine, Georgia 31569.

## FACTUAL ALLEGATIONS

8.   Alda Gentile is Cody White's mother.

9.   Gentile owns Lexington Taxi and Limousine in New York.

10.   Gentile wants to move to Florida to escape the cold winter weather.

11.   On September 12, 2012, Gentile's boyfriend – George Dubanos - rented a Chrysler 300 for Gentile because Gentile and White were going down to Florida to look for a house.

12.     The Rental Agreement was in the Chrysler 300.  The Rental Agreement does not list the names of authorized drivers, including the name of the person who rented the car – George Dubanos.

13.     Gentile has always kept a significant amount of money in her home.

14.     Gentile does not like to keep all her savings in the bank.

15.     Gentile brought her cash savings with her to Florida so that she could make a down payment if she found a house she liked.

16.     Gentile hid the money in an unlikely place – a Clorox wipes dispenser – and kept it in the trunk while they were driving; she brought the money with her went they went into a hotel for the night.

17.     Gentile figured that if anyone broke into the trunk or tried to rob her hotel room, they would be unlikely to look inside a Clorox wipes dispenser for anything of value.

18.     When they left New York, Gentile had more than $11,000.00 in cash.

19.     Gentile and White drove down to Florida.

20.     White brought his infant son – Daniel Gentile – with them on the trip to Florida.

21.     During the trip, Gentile and White used some of the money to pay for gas, food and lodging.

22.     Gentile and White spent several days in Florida looking at houses.

23.  Gentile did not find a house she wanted to buy and the car was due back in New York on September 20, 2012 so Gentile and White left Florida.

24.  On September 19, 2012, White was driving northbound on I-95 in Camden County, Georgia.

25.  Defendant Blake Taylor was patrolling I-95 Northbound.

26.  Taylor clocked White driving approximately 92 miles per hour – 22 miles over the speed limit of 70 miles per hour.

27.  Taylor got behind the Chrysler 300 and turned on his emergency lights.

28.  White saw Taylor behind him with his emergency lights on and understood that Taylor wanted him to pull over.

29.  White immediately pulled over on shoulder of the road.

30.  When Taylor activated his emergency lights, the dash camera and audio system in his vehicle automatically turned on; however, the camera apparently malfunctioned.  The audio system worked and recorded the traffic stop.  A true and correct copy of the audio recording is attached hereto as Exhibit "A" and incorporated herein by reference.

31.  Before exiting his vehicle, Taylor contacted the Camden County 9-1-1 center and asked the operator to send a Camden County Sheriff's Office canine unit to the scene.

32.     At the time he requested the canine unit, Taylor had no reasonable articulable suspicion that the occupants of the Chrysler 300 possessed drugs or any substance that might be detected by a canine unit.

33.     The traffic stop began at approximately 18:16 hours.

34.      White and Gentile remained seated in the Chrysler 300 and did not engage in any furtive movements.

35.     Gentile never threw anything out of the vehicle.

36.     Taylor called Georgia State Patrol dispatch and asked them to run the license plate on the Chrysler 300; the license plate came back as valid.

37.     Taylor walked up to the driver's side of the Chrysler 300.

38.     White rolled his window down.

39.     Taylor asked White where they were headed; White responded that they were driving home to New York.

40.     Taylor informed White that he stopped him for driving 92 mph when the speed limit was 70 mph.

41.     Taylor did not smell anything unusual coming from the car.

42.     Taylor did not see any item in plain view that caused him to suspect that the occupants of the car were engaged in illegal activity.

43.     Taylor asked White to exit the car and roll up his window.

44.     Taylor asked White, "whose car is this?" White responded, "it's a rental."

45. Taylor asked White if he had drugs, weapons or anything else in the car that was not supposed to be there; White responded, "No."

46. Taylor asked White for a copy of the Rental Agreement; White got it out of the car and gave it to him.

47. Gentile rolled her window down to get some fresh air; Taylor ordered her to roll her window back up.

48. Taylor inspected the Rental Agreement and asked White who rented the car; White told him that Gentile's boyfriend rented the car.

49. Taylor told White that if Gentile's boyfriend rented the car "he's supposed to be the one driving it" and their names should be on the agreement if they were allowed to drive the car.

50. At the time, Taylor knew that it was not a criminal offense to drive a rental car without prior authorization from the rental car company.

51. Taylor had no basis in fact to conclude that White and Gentile were not in lawful possession of the vehicle.

52. Taylor had no basis in fact to conclude that White and Gentile were driving a stolen vehicle.

53. Taylor asked White when they left New York; White responded that they left on September 13 – the day after the date the vehicle was rented according to the Rental Agreement.

54.     Taylor asked White if they had anything in the truck; White responded that they had their luggage in the trunk.

55.     Taylor returned to his patrol car with White's New York driver's license.  Taylor asked his dispatch officer to run White's license through the national database.  The dispatch officer informed Taylor that White's license was valid.

56.     18 minutes after he intiated the traffic stop, Taylor finally presented White with a traffic ticket for speeding.  White asked if he could reduce the ticket to a warning and Taylor refused.

57.     White signed the ticket and said, "Thank you.  Have a good day officer."

58.     Taylor interrupted White and said, "Before you leave, I've got a unit coming with a dog."  He told White that what the dog would do is walk around the car.

59.     White said, "Ok."

60.     White did not understand Taylor's statement as a request; he reasonably believed that he was not free to drive away.

61.     When he ordered White to remain at the scene, Taylor had no articulable basis for believing that a drug dog would alert to the presence of drugs in the Chrysler 300.

62.     The facts known to Taylor were that" (a) White was speeding; (b) White had his mother and his infant son in the car; (c) White had cooperated with all of Taylor's instructions; (d) White had responded truthfully to all of his questions; (e) the

Chrysler 300 was properly registered in Florida; (f) Taylor had a valid Rental Agreement for the car that did not list any drivers; (g) White had a valid driver's license issued by the State of New York; (h) White told him that they were driving home to New York; (i) the Rental Agreement showed that the car was rented in New York on September 12th and White told him they left New York the next day; (j) Taylor saw nothing in plain view inside the vehicle to arouse a reasonable suspicion that White and Gentile were harboring contraband; (k) White told Taylor that there were no drugs or other contraband in the vehicle; and (l) White told Taylor they had luggage in the trunk.

63. An objectively reasonable and well trained officer in Taylor's position would have known that he had no articulable basis for prolonging the traffic stop so that a canine unit could come to the scene.

64. Defendant Deputy Will Woolard, a Camden County Sheriff's Department officer, arrived on the scene.

65. Taylor summarized the facts as set forth *infra* ¶ 62 for Woolard.\

66. Taylor claimed that he saw Gentile throw things out of the car.

67. Taylor claimed White consented to remain on the scene for a canine unit.

68. Taylor asked Woolard to talk to White and Gentile because "Y'all can read people a lot better than me."

69.     Woolard talked to White outside of the Chrysler 300.

70.     White told Woolard exactly what he told Taylor.  There were no inconsistencies at all.

71.     White said nothing that would have aroused the suspicions of an objectively reasonable officer.

72.     Woolard asked White what was in the trunk; White said that they had luggage in the trunk.

73.     Woolard said, "no marijuana, no cocaine, no X, no methamphetamines?"  White said no.

74.     Woolard asked if there was any money in the trunk; White responded that Gentile had money in the trunk.

75.     Woolard asked how much money; White responded that he did not know.

76.     Woolard asked if it was enough to buy a house? White replied, "No."

77.     Defendant Cedric Brown, a Sergeant in the Camden County Sheriff's Department, arrived on the scene.  Brown operated a canine unit.

78.     Brown approached Taylor and asked him what was going on?

79.     Taylor told him, "**He did not consent to a search; he just admitted there was cash in the trunk**." (Ex. A., 25:30.)

80.     Taylor, Brown and Woolard reached an understanding that they would open and search the trunk of the Chrysler 300 and seize the money even though

neither White nor Gentile had consented to the search and no probable cause existed to search the trunk.

81. In furtherance of the conspiracy, Defendants agreed that Brown would fabricate having the canine alert to the trunk so that they would appear to have a lawful basis for searching the trunk.

82. These Defendants knew that the course of action they were going to pursue – opening and searching the trunk of the car without consent or probable cause – violated Plaintiffs Fourth Amendment rights.

83. These Defendants knew that fabricating evidence of probable cause to justify an illegal search and seizure violated the Fourth Amendment.

84. These Defendants knew that detaining Plaintiffs on the side of the highway without any articulable facts to support a prolonged traffic stop violated Plaintiffs' Fourth Amendment rights.

85. Gentile asked for permission to get out of the car.  Taylor had not allowed her to get out of the car during the traffic stop that had now lasted more than 30 minutes.

86. Taylor relented and allowed Gentile to get out of the car with White's infant son.

87.  Taylor ordered Gentile to stand at the front of the car; he told her she could "sit on the bumper or something."

88.     In furtherance of the conspiracy, Brown conducted a "free air" search around the Chrysler 300 with a drug dog.

89.     Brown falsely claimed that the drug dog had alerted to the trunk.

90.     Upon information and belief, Brown's canine unit is trained in a manner consistent with national training standards for police canine units.

91.     Consistent with those standards, canines are trained to detect the presence (by smell) of illegal drugs.

92.     Brown's canine unit could not have alerted to the trunk of Plaintiffs' car because there were no drugs, drug paraphernalia or drug residue located in the trunk.

93.     Consistent with national standards, Brown's canine unit was not trained to detect (by smell) money.

94.     31 minutes into the traffic stop, Defendants participated in an illegal search of the trunk of the Chrysler 300 without consent or probable cause.

95.     Defendants also searched the passenger compartment of the Chrysler 300.

96.     Defendants also searched Plaintiffs personal effects, including Gentile's hand bag and the items in their luggage.

97.     33 minutes into the traffic stop, Taylor asked Woolard to switch positions so that Woolard's dashboard-mounted camera could record the officer's activities.

98.     Woolard and Taylor moved their vehicles so that Woolard's vehicle was now directly behind the Chrysler 300.

99.     Defendant Woolard and Brown were equipped with body mikes designed to record their communications with citizens and other officers on the scene of a traffic stop.

100.    Defendant Woolard and Brown's vehicles were equipped with dashboard-mounted cameras for the purpose of creating a video record of a traffic stop.

101.    In furtherance of the conspiracy among all the Defendants, Brown and Woolard destroyed the audio and video evidence recorded on their body microphones and dashboard cameras in the days following their participation in the illegal detention, search and seizure of the Plaintiffs and their property.

102.    In furtherance of the conspiracy among all the Defendants, Brown and Woolard did not prepare reports associated with the incident, even though Brown stated that he would fill out his paperwork while Defendants remained on the scene.

103.    During their illegal search of the trunk, Defendants located Gentile's money - $11,530.00 – in the Clorox Wipes container.

104.    Trooper FNU Rozier arrived on the scene.  His vehicle was also equipped with a dashboard-mounted video and an audio system that included a body-microphone.  Rozier's "dash-cam" recorded a portion of the traffic stop.  A true and correct copy of Rozier's "dash-cam" video is attached hereto as Exhibit "B".

105.    Defendants asked Gentile about the money.

106.    Gentile told Defendants that it was her money that she had saved over the course
         of many years.

107.    She told the officers that she intended to use it to make a down payment on a
         house in Florida.

108.    She also told them that they were depending on using some of the money to pay
         for their gas, food and lodging on their way home to New York.

109.    One of the Defendants mocked Gentile telling her that it might not be against the
         law, but it was foolish to keep money "stashed under the mattress."

110.    He asked her why she didn't write a check for the down payment.

111.    One of the Defendants told her that she had to "prove where she got the money
         from."

112.    Gentile told the officer that she was Italian and didn't like banks; she said she
         likes to have money with her.

113.    She said she "Did not know it was illegal."  She told him that she thought this
         was still a free country.

114.    Gentile told him that the entire situation was starting to feel like the movie, "My
         Cousin Vini."

115.    Gentile told the Defendants "We have done nothing illegal, nothing illegal in the
         car, just me, my son and grandson. This is crazy to me."

116.  Gentile told the Defendants "I have never seen anything like this in my life, you say my son was speeding, just give him a ticket, but you have searched my car and my pocket book, I can't believe this."

117.  One of the Defendants told Gentile "I am sure they had a good enough reason to do that (referring to the search of the car and pocketbook)."

118.  Gentile replied, "No, we had no drugs or alcohol."

119.  The Defendant replied, "I can tell you one thing, neither your name nor his name being on the rental agreement."

120.  Defendants knew that whether White and Gentile's names appeared on the Rental Agreement did not matter at all unless they had some reason to believe that the Plaintiffs were not in lawful possession of the Chrysler 300.

121.  Defendants knew that the Chrysler 300 had not been reported stolen and that they had no basis in fact to believe that White and Gentile were not in lawful possession of the vehicle.

122.  Defendants knew that they had no articulable basis for prolonging the traffic stop; no consent or probable cause to search the vehicle; and no probable cause to seize Gentile's property.

123.  Despite knowing with absolute certainty that they were violating Plaintiffs' Fourth Amendment rights, Defendants continued the detention, searched the trunk and seized Gentile's money.

124.   Defendants knew that they had no objective facts justifying seizure of Plaintiffs' property under Georgia's civil forfeiture statute as the money was not located in close proximity to drugs or contraband associated with the drug trade.

125.   Defendants decided that Taylor should call the "on call" agent with the Drug Enforcement Administration (DEA) because they believed that the DEA had more authority to seize money under Federal law.

126.   Taylor called the DEA and spoke with Agent Elliot.

127.   Taylor told Elliot that they had found a large sum of money in the trunk of the Plaintiffs' vehicle but did not inform Elliot that the Defendants had been unlawfully detaining Plaintiffs; fabricated a canine alert; illegally searched the trunk and seized the money.

128.    Elliot knew that under Federal law, seizing money without a search warrant violated the Fourth Amendment unless probable cause existed to believe that the property was subject to forfeiture and either: (a) the seizure was made pursuant to a lawful arrest or search; (b) an exception to the Fourth Amendment's warrant requirement applied; or (c) the property was lawfully seized by a State or local law enforcement agency and transferred to a Federal agency.

129.   Based on the limited information provided by Taylor, Elliot believed that the last exception to the Fourth Amendment's warrant clause applied; therefore he told Taylor to seize the money.

130.   Had Taylor informed Elliot of the true circumstances, Elliot would not have told Taylor that he could seize the money under Federal law.

131.   Taylor asked Brown what he thought the DEA would do with the money once the facts of the seizure were known to Elliot and his supervisors.

132.   Brown told Taylor that he thought they (DEA) would "give it back, I really do."

133.   Taylor said to Brown, "Would you go down swinging?"

134.   Brown told Taylor that it was worth seizing the money even though Taylor had no probable cause to do so as sometimes "you never hear from them again."  By "them," Brown was referring to people like the Plaintiffs' who are subject to having their property seized by law enforcement because they committed a traffic offense.

135.   Brown, Taylor and the other Defendants on scene talked about how their agencies would each "get a piece" of the money, although the Georgia State Patrol would get the lions' share because Taylor made the stop.

136.   More than 3 hours after Taylor first stopped White for speeding, Taylor told Gentile that they were seizing her money.

137.   He ordered them to follow him to the GSP Post so that the money could be counted by his superior officer.

138.   GSP Sergeant Chad Gray arrived on scene to assist in counting the money.

139. After they counted the money, Taylor told Plaintiffs that they were free to go but that Gentile's money was going to the DEA.

140. The following day, Gray went to Bank of American and got a cashier's check payable to the U.S. Marshall's Service for $11,530.00.

141. GSP command staff reviewed the circumstances of the seizure and concluded that there was no arguable basis for seizing Plaintiffs' property.

142. DEA officials reviewed the circumstances of the seizure and concluded that there was no arguable basis for seizing Plaintiffs' property.

143. On September 25, 2012, Taylor went to Bank of America with the cashier's check and secured a new cashier's check made payable to Alda Gentile.

144. Taylor mailed the cashier's check to Alda Gentile by Federal Express.

## COUNT I
### FOURTH AMENDMENT – 42 U.S.C. § 1983
### (Conspiracy to Violate the Fourth Amendment)

145. Paragraphs 24 through 144 set forth the facts giving rise to this cause of action and are thus incorporated herein by this reference.

146. At all times relevant to this action, the individual defendants were acting under color of state law and within the scope of their discretionary functions as law enforcement officers employed of the State of Georgia (Taylor) and Camden County, Georgia (Woolard & Brown).

147.  Taylor worked for GSP. He conspired with Woolard and Brown, who worked for CCSO, to violate Plaintiffs Fourth Amendment rights.

148.  Defendants knew that GSP and CCSO had a financial interest in the proceeds of a successful civil forfeiture proceeding following seizure of Gentile's property.

149.  Defendants violated Plaintiffs' Fourth Amendment rights by detaining them on the side of a highway for more than 3 hours without reasonable suspicion or probable cause to believe Plaintiffs were engaged in unlawful activity.

150.  Defendants violated Plaintiffs' Fourth Amendment rights by fabricating evidence of probable cause to justify the illegal search of the trunk of the Chrysler 300.

151.  Defendants violated Plaintiffs' Fourth Amendment rights by rummaging through the trunk of Plaintiffs' car and the contents therein without consent or probable cause.

152.  Defendants violated Gentile's Fourth Amendment rights by seizing her property - $11, 530.00 – without probable cause to believe that the money was related to illegal activity of any kind.

153.  Under the facts and circumstances alleged herein, objectively reasonable law enforcement officers would have known that reaching an agreement to perform the actions described herein violated the Fourth Amendment of the United States Constitution.

154.   At all times relevant to this action, statutory and common law established with obvious clarity that prolonging a traffic stop without reasonable suspicion or probable cause violated the Fourth Amendment of the United States Constitution.

155.   At all times relevant to this action, statutory and common law established with obvious clarity that searching the trunk of a vehicle without a valid arrest, probable cause or consent violated the Fourth Amendment of the United States Constitution.

156.   At all times relevant to this action, statutory and common law established with obvious clarity that seizing the personal property of a citizen without probable cause to believe that it is related in some manner to illegal activity violated the Fourth Amendment of the United States Constitution.

157.   As a direct and proximate cause of the Defendants' unlawful actions, Plaintiffs incurred economic damages in an exact amount to be proven at trial.

158.   As a direct and proximate cause of the Defendants' unlawful actions, Plaintiffs' experienced pain, suffering, emotional distress, anxiety, humiliation, outrage and loss of reputation entitling them to an award of compensatory damages in an amount to be determined by the enlightened conscience of the jury.

159.   Defendants acted willfully, deliberately, and maliciously, thereby entitling Plaintiffs to an award of punitive damages in an amount to be determined by the enlightened conscience of the jury.

**WHEREFORE**, Plaintiffs respectfully requests the following relief:

A)   That economic damages be awarded to compensate the Plaintiffs for their economic injuries as a consequence of the Defendants' violations of their rights in an amount to be determined by the enlightened conscious of the jury;

B)   That compensatory damages be awarded against the Defendants to compensate Plaintiffs for their pain and suffering, mental and emotional distress, anxiety, humiliation and outrage, as a consequence of the Defendants' actions  in an amount to be determined by the enlightened conscious of the jury;

C)   That punitive damages be awarded against the Defendants in an amount to be determined by the enlighten conscious of the jury to deter them and others from similar misconduct in the future;

D)   That a trial by jury be had on all issues wherein a jury trial is permitted under law;

E)   That attorney's fees and expenses of litigation be awarded as authorized under 42 U.S.C. §1988;

F)      That prejudgment interest be awarded; and,

G)      That the Court award such other relief as the Court deems just and proper.

This  15th Day of September, 2014.

Respectfully submitted,

/s/William J. Atkins
WILLIAM J. ATKINS
State Bar No.  027060

ATKINS & FIFE, LLC
6400 Powers Ferry Road, Suite 355
Atlanta, Georgia 30339
Telephone: (404) 969-4130
bill@atkinsfife.com